## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

JAMES PHIMISTER, Personal Representative )
of the Estate of Avi Lane Friedlich, )
            )
       Plaintiff, )
            )
       v. )     Case No. _____
            )
C. R. BARD, INC., a New Jersey Corporation, )
and BARD PERIPHERAL VASCULAR, INC., )
(a subsidiary and/or division of defendant C. R. )
BARD, INC.), an Arizona Corporation, )
            )
       Defendants. )

## COMPLAINT
### (Product Liability)

Plaintiff James Phimister, Personal Representative of the Estate of Avi Lane Friedlich, files this Complaint for personal injuries and damages sustained as a result of Defendants' negligent and intentional misconduct.

### INTRODUCTION

1. This is a product-liability action arising out of the malfunction and resulting injuries to Plaintiff from a Denali inferior vena cava ("IVC") filter (the "Filter") that was implanted in Avi Lane Friedlich ("Decedent") on July 7, 2017, at South Shore Health Hospital in South Weymouth, MA.

2. An IVC filter is an implantable medical device that is placed in the IVC— the body's largest vein that carries blood to the heart and lungs—purportedly to catch blood clots before they reach the heart and lungs.

3. In the early 2000s, Defendants Bard Peripheral Vascular, Inc. and C.R. Bard, Inc. (hereinafter collectively "Bard") were manufacturers in the IVC filter market that saw an opportunity to expand the existing market and to increase their share of that market by developing an IVC filter that could be retrieved after implantation. Prior to that time, IVC filters were permanent-only devices, implanted for the lifetime of a patient and not capable of removal without major surgery. The existing, permanent devices were

designed to be sturdy so they could be permanently implanted in a patient's IVC without tilting, migrating, or breaking. Bard sold a permanent IVC filter called the Simon Nitinol Filter ("SNF") that, like most permanent filters, had a long history of extremely low complication rates.

4.      Bard believed that it could substantially increase its share of the U.S. IVC filter market, and thus its profits, by introducing a retrievable filter. Bard knew that other competing medical device manufacturers were also working on retrievable IVC filters, and the company that would win the race to the market by introducing its product first would reap most of the rewards. Bard concluded that it could overcome the "absence of solid clinical history" for its new retrievable filter through "aggressive marketing." And, as a result, it began to design and develop an IVC filter that could be retrieved after implant.

5.      To win the race to market, Bard took shortcuts in both (1) designing and testing of its permanent-but-retrievable IVC filters and (2) obtaining regulatory clearance from the FDA to sell the filter. Significantly, though Bard marketed and sold its retrievable filters as permanent devices that could be safely retrieved after implant, Bard never designed nor tested the filters for permanent implantation. For its first-generation device, the Recovery filter, Bard conducted a single human clinical trial that was not a safety or effectiveness study; rather, it was a short-term study as to whether the device could be safely retrieved shortly after implantation. The study demonstrated significant incidence of device malfunctions, including a fracture and migration of the Recovery observed after a short interval in just 33 patients, significantly higher than Bard's predicate device for the retrievable filters, the SNF. Despite these results, Bard never did any studies nor any trials of the retrievable filters to determine if they were safe and effective as a permanent filter. Bard did not call off its release of the filters; instead, Bard charged forward and sold the filter to doctors and patients across the country, including Decedent. Significantly, Bard sold the filters as "permanent" devices with the "option" of retrieval—representing first and foremost that the devices were safe to be implanted for a lifetime.

6.     To be able to sell the filters, Bard made misrepresentations to the FDA to obtain "clearance" for the sale of the filter. Clearance comes under the FDA's far less restrictive 510(k) process—a streamlined path in which a company represents that its product is so substantially similar to a product that has already been approved by the FDA to be on the market that there is no need to fully vet and test whether the product is safe and effective. Bard promised the FDA that its new retrievable filter was "substantially equivalent" to the SNF, and that the filter was just as safe and effective when permanently left in the human body.

7.     But, Bard had absolutely no such proof. Indeed, its actual testing of its filters demonstrated precisely to the contrary.

8.     Unsurprisingly, and almost immediately, patients began experiencing major complications with Bard's retrievable filter—it was breaking/fracturing and migrating to the heart at rates not previously seen with IVC filters. In the first 10 months after full market release, there were nine patient deaths from Bard's Recovery filter. Bard was unable to determine the root cause for those deaths, but, rather than pull the product from the market, it continued to market and sell the filter to doctors and patients, assuring them that there was no real problem, while at the same time forming a team to respond to what it called a "crisis."

9.     Further, Bard found that its Recovery filter was failing and causing death at rates many times higher than other IVC filters, including its own SNF, the predicate device. Still, Bard did not pull the filter from the market. Rather, while it continued to sell the Recovery and without understanding why the Recovery was failing at such high rates, Bard designed a second generation (G2) filter on the fly. And, again, rather than test its safety and efficacy (particularly as a permanent device), Bard sold that second-generation filter to doctors and patients with little to no idea how it would perform long-term. But, Bard did not recall or place a meaningful hold on the product, warn doctors and patients of what it knew internally about the dangers of the device, nor take any action to protect patients, including Decedent.

10.     Bard's design for the Filter was defective because its risks outweighed its

benefits, and it failed to meet the reasonable expectations of consumers. Indeed, developing science suggests that all IVC filters, including the Filter, provide no benefit whatsoever to patients. The choices that Bard made in designing all of its permanent-but-retrievable filters, including the Filter, rendered the devices defective. There are reasonable alternative designs of IVC filters on the market that include additional safety features, such as elements to reduce the fracture risk, and improvements in the anchoring mechanism to prevent tilting, movement (migration), and perforation (failure modes that also increase the risk of fracture). Bard similarly was negligent in its design of the Filter.

11.     Further, Bard failed to provide adequate warnings regarding the risks of all of its permanent-but retrievable filters, including the Filter. Bard knew that the Filter presented significantly increased risks of failures, including fracture, migration, tilt, and perforation as compared to other available IVC filters, including its own SNF. Nonetheless, it failed to warn doctors and patients of these significantly increased risks and the risks specific to its IVC filters. Still, Bard actively marketed the Filter as being safer than, or at least as safe as, other devices. Bard was similarly negligent in failing to provide adequate warnings regarding the Filter.

12.     Bard was negligent in its testing of the Filter prior to release. Bard failed to conduct worst-case scenario testing as required by standards of reasonable engineering and the federal Food and Drug Administration ("FDA") guidance documents.

13.     Bard was negligent in its post-market monitoring of the Filter because it was aware that the risks posed by the device exceeded the burden of taking available safety measures that would have reduced the risk of harm. These safety measures include the failure to warn and the failure to incorporate additional safety features.

14.     Bard was negligent in failing to recall or stop marketing the Filter after realizing that its IVC filters were not performing as expected, and that the Filter was significantly more likely to fail and cause injury than other available devices. The filters' risks exceeded their benefits, and they were not the substantial equivalent of the predicate device—Bard's own SNF filter.

15.     Bard also engaged in fraud, deceit and concealment by knowingly

misrepresenting the benefits of the Filter through concealing and downplaying the risks so as to maintain sales and stock prices, and to keep consumers and victims such as Decedent ignorant of the filter's defects. Despite knowing that the Filter was substantially more likely to fracture, migrate, tilt, and cause death than other filters, Bard marketed the Filter as being safer and more effective than all other filters. Despite information demonstrating a lack of safety and efficacy, Bard failed to warn physicians or patients, such as Decedent, that the device should be promptly removed after the acute risk of clotting passed.

16.     Bard misrepresented the safety and effectiveness of its permanent-but-retrievable IVC filters, including the Filter. Bard sold all of its IVC filters as permanent devices; specifically identifying each filter as indicated for use "via permanent placement" in the IVC. But, Bard did not do adequate testing to ensure that the filters were safe for permanent implantation in the human body; and Bard knew from the testing it did perform that its permanent-but-retrievable filters were not the substantial equivalent of, and not as safe as, its permanent-only filter, the SNF.

17.     Moreover, Bard failed to conduct any form of clinical trials or patient studies to determine whether any of their IVC filters offered any utility or clinical benefit to patients.

18.     To date, there are no patient studies showing any evidence that Defendants' IVC filters protect against fatal pulmonary emboli.

19.     Decedent suffered damages as a result of Bard's actions. The filter perforated his IVC, caused a thrombus, retroperitoneal hemorrhage, and cardiac arrest. As a result, Decedent suffered pain, emotional distress, and loss of enjoyment of life, and death.

**PARTIES**

20.     Decedent Avi Lane Friedlich was a citizen and resident of Massachusetts at the time of his filter implantation and death. The Filter was implanted in  Massachusetts.

21.     Plaintiff James Phimister, Personal Representative of Decedent's estate, is a citizen and resident of Massachusetts.

22.     Defendant C.R. Bard, Inc. ("Bard") is a corporation duly organized and existing under the laws of the state of Delaware, with its principal place of business at 1 Becton Drive, Franklin Lakes, New Jersey 07417.

23.     Bard, at all times relevant to this action, designed, set specifications for, manufactured, prepared, compounded, assembled, processed, marketed, distributed, and sold its permanent-but-retrievable IVC filters, including the Filter, to be implanted in patients throughout the United States, including in the Commonwealth of Massachusetts.

24.     Defendant Bard Peripheral Vascular, Inc. ("BPV") is a wholly-owned subsidiary corporation of Defendant Bard, with its principal place of business at 1415 West Third Street, Tempe, Arizona 85281.

25.     BPV, at all times relevant to this action, designed, set specifications for, manufactured, prepared, compounded, assembled, processed, marketed, distributed, and sold its permanent-but-retrievable IVC filters, including the Filter, to be implanted in patients throughout the United States, including in the Commonwealth of Massachusetts.

26.     At all times relevant to this action, each Defendant was the agent, servant, employee and/or joint venturer of the other, and each was acting in the full course, scope, and authority of said agency, service, employment and/or joint venture.

27.     At all times relevant to this action, Defendants were also known as, formerly known as, and/or were the successors and/or predecessors in interest/business/product line/or a portion thereof, assigns, a parent, a subsidiary (wholly or partially owned by, or the whole or partial owner), affiliate, partner, co-venturer, merged company, alter egos, agents, equitable trustees and/or fiduciaries of and/or were members in an entity or entities engaged in the funding, researching, studying, manufacturing, fabricating, designing, developing, labeling, assembling, distributing, supplying, leasing, buying, offering for sale, selling, inspecting, servicing, contracting others for marketing, warranting, rebranding, manufacturing for others, packaging, and advertising of the Filter.

28.     Defendants are jointly and severally liable for the acts, omissions and tortious conduct of their successors and/or predecessors in interest/business/product

line/or a portion thereof, assigns, parent, subsidiary, affiliate, partner, co-venturer, merged company, alter ego, agent, equitable trustee, fiduciary and/or their alternate entities in that Defendants enjoy the goodwill originally attached to each such alternate entity, acquired the assets or product line (or a portion thereof), and in that there has been a virtual destruction of Plaintiff's remedy against each such alternate entity, and that each such Defendant has the ability to assume the risk-spreading role of each such alternate entity.

29.     At all times relevant to this action, Defendants were and are authorized to do and are doing business in the Commonwealth of Massachusetts and regularly conducted business in the Commonwealth of Massachusetts.

30.     At all times relevant to this action, Defendants were engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce and into the Commonwealth of Massachusetts, either directly or indirectly through third parties or related entities, its products, including the Filter.

31.     At all times relevant to this action, Defendants conducted regular and sustained business and engaged in substantial commerce and business activity in the Commonwealth of Massachusetts, including but not limited to researching, developing, selling, marketing, and distributing their products, including the Filter, in the Commonwealth of Massachusetts.

32.     At all times relevant to this action, Defendants expected or should have expected that their acts would have consequences within the United States, including in the Commonwealth of Massachusetts, and said Defendants derived and continue to derive substantial revenue therefrom.

**JURISDICTION AND VENUE**

33.     This Court has original jurisdiction pursuant to 28 U.S.C. §1332 as there is diversity of citizenship and the amount in controversy exceeds $75,000.

34.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this

judicial district, and because all Defendants are subject to the Court's personal jurisdiction in this judicial district.

## GENERAL ALLEGATIONS

### Inferior Vena Cava Filters Generally

35.     IVC filters first came onto the medical market in the 1960s. Over the years, medical device manufacturers have introduced several different designs of IVC filters.

36.     An IVC filter is a device that is intended to filter or "catch" blood clots that travel from the lower portions of the body to the heart and lungs. IVC filters are designed to be implanted, either permanently or temporarily, in the IVC.

37.     The IVC is a vein that returns blood to the heart and lungs from the lower portions of the body. In certain people, and for various reasons, blood clots travel from the vessels in the legs and pelvis, through the vena cava and into the lungs. These blood clots often develop in the deep leg veins, a condition called "deep vein thrombosis" or "DVT." When such blood clots reach the lungs, they are considered "pulmonary emboli" or "PE." Pulmonary emboli present serious risks to human health.

38.     People at risk for DVT/PE can undergo medical treatment to manage the risk. For example, a doctor may prescribe medications like Heparin, Warfarin, or Lovenox to regulate the clotting factor of the blood. In some people who are at high risk for DVT/PE, or who cannot manage their conditions with medications, physicians have recommended surgically implanting an IVC filter to prevent thromboembolic events.

39.     The first IVC filters sold were permanent filters. These devices were designed to be left in a patient's IVC permanently and have long-term follow-up data (of up to 20 years and longer) demonstrating their risks and the frequency of occurrence of such risks, which are relatively low.

40.     Beginning in 2003, manufacturers also began marketing what are known as "optional" or "retrievable" filters. These filters were designed so that, in theory, they could be surgically removed from a patient after implantation, presumably after the risk of PE subsided. These optional or retrievable filters are sold as permanent filters with an option to remove them, in some cases within a window of time; in the case of Bard's

filters, it claims there is no window limiting retrieval.

41.     In order to increase sales of these devices, Bard sought to expand the market for prophylactic use among nontraditional patient populations that were temporarily at risk of developing blood clots.

42.     Specifically, Bard targeted the bariatric, trauma, orthopedic and cancer patient population. Expansion to these new patient groups would triple sales and the first manufacturer to market would capture market share.

43.     While Bard sells its "retrievable" filters as permanent devices with unlimited retrieval windows, Bard never designed or properly tested the filters for safety as permanent devices and, over time, they demonstrated both a significantly increased risk of failure and of becoming irretrievable.

**The Recovery Filter**

44.     In the early 2000s, Bard began development of its first generation "retrievable" filter, called the Recovery filter (hereafter "Recovery" or "Recovery Filter").

45.     The Recovery Filter consists of two (2) levels of six (6) radially distributed struts that are designed to anchor the filter into the inferior vena cava and to catch any embolizing clots. There are six short struts, which are commonly referred to as the arms, and six long struts, which are commonly referred to as the legs. Each strut is held together by a single connection to a cap located at the top of the device. According to the Patent filed for this device, the short struts are primarily for "centering" or "positioning" within the vena cava, and the long struts with attached hooks are designed primarily to prevent the device from migrating in response to "normal respiratory movement" or "pulmonary embolism."

46.     The Recovery filter is made out of "Nitinol", an acronym for Nickel Titanium Naval Ordinance Laboratory. "Nitinol" possesses "shape memory," meaning it will change shape according to changes in temperature, and then resume its prior shape after returning to its initial temperature. When placed in saline, therefore, the Nitinol struts become soft and can be straightened to allow delivery through a small diameter

catheter. The metal struts then resume their original shape when warmed to the body temperature in the vena cava.

47.    An IVC filter is typically implanted in the IVC via a catheter guided by a physician (usually an interventional radiologist) through a blood vessel into the IVC. The implanting physician normally reviews an imaging study prior to placement to determine the IVC's size, renal vein location, and to identify any venous anomalies or clots in the vena cava. Following filter placement, the physician will normally use an imaging study to confirm successful placement. The Recovery filter was designed to be retrieved in a similar fashion.

48.    During the design and development stage of the Recovery filter, Bard conducted a small clinical trial (involving human patients) to evaluate the retrievability of its Recovery filter. In a short- term setting involving fewer than 40 patients, the Recovery filter had three (3) significant failures: the first was that a filter moved substantially (migrated) from its location of implant toward the patient's heart; the second was that one filter broke (fractured) in two different places, resulting in pieces of the filter breaking apart and separating from the filter so that they could freely travel to the heart. Despite those problems, Bard took no action to redesign the filter or to stop the process toward sale.

49.    In 2002, Bard submitted a notification of intent to the FDA to market the "Recovery Filter System" for the prevention of recurrent pulmonary embolism by placement in the IVC. Bard submitted the notification under Section 510(k) of the United States Food, Drug and Cosmetic Act of 1976 (21 U.S.C. 321 et seq.) ("Act"). The 510(k)-review process requires any entity engaged in the design, manufacture, distribution or marketing of a device intended for human use to notify the FDA 90 days before it intends to market the device and to establish that the device is substantially equivalent to a legally marketed predicate device. (21 C.F.R. §§ 807.81, 807.92(a)(3).) "Substantial equivalence" means that the new device has the same intended use and technological characteristics as the predicate device. This approval process allows a manufacturer to bypass the rigorous safety scrutiny required by the pre-market approval process.

50.     Bard identified the SNF as one of the Recovery's predicate devices, representing to the FDA that the Recovery was the substantial equivalent to the SNF in terms of safety, performance, and efficacy. On November 27, 2002, the FDA cleared the Recovery filter for marketing and use in the prevention of recurrent pulmonary embolism via *permanent* placement in the vena cava in the following situations:

     a.  Pulmonary thromboembolism when anticoagulants are contraindicated;

     b.  Failure of anticoagulant therapy for thromboembolic disease;

     c.  Emergency treatment following massive pulmonary embolism where anticipated benefits of conventional therapy are reduced;

     d.  Chronic, recurrent pulmonary embolism where anticoagulant therapy has failed or is contraindicated.

51.     In April 2003, Bard and BPV submitted a Section 510(k) premarket notification.

52.     Bard and BPV began actually marketing the Recovery Filter in April 2003, but full market release did not occur until January 2004. Bard was aware that the Recovery filter also was used extensively off-label, including for purely prophylactic reasons for trauma patients or patients with upcoming surgeries, such as bariatric (weight loss) and orthopedic procedures.

53.     Bard embarked on an aggressive campaign of "off label marketing." Bard made representations to physicians, healthcare professionals, and other members of the medical community that the Recovery filter was safe and effective for retrievable use, including prior to the FDA approving the Recovery filter for retrievable use.

54.     Prior to full market release, Bard failed to adequately test the Recovery Filter for safety as a permanent filter. In particular, it failed to test the filter to determine that it was reasonably safe under foreseeable worst-case scenario conditions, including the likelihood that it would tilt and the result of such tilting.

55.     Further, Bard's lab tests to simulate migration resistance consistently demonstrated that, among available IVC filters, the Recovery was the worst at resisting migration and was significantly worse than the SNF. Thus, contrary to Bard's

representation to the FDA, the Recovery was not the substantial equivalent of the SNF.

56.     Moreover, after Bard's internal special design review committee raised questions in December 2003 as to the safety of the Recovery, particularly its ability to resist migration, Bard did not stop its full market release of the filter or even answer the significant safety questions raised by the committee prior to release. Rather, Bard proceeded to full market release and conducted some (but not all) of the committee's requested testing after the product was already on the market. And, then, the Recovery failed the tests, failing to meet the safety threshold Bard had established for migration resistance.

57.     Shortly after full market release, Bard began receiving reports of significant filter failures, including migration of device fragments to the heart, and death.

58.     The Recovery Filter is prone to an unreasonably high risk of failure and patient injury following placement in the human body. Multiple studies report Bard's Recovery Filter to have a fracture and migration rate ranging from 21% to 31.7%. *See e.g.*, Hull JE, Robertson SW. Bard Recovery Filter: Evaluation and Management of Vena Cava Limb Perforation, Fracture and Migration. *J Vasc Interv Radiol.* 2009;20(1):52-60; Nicholson W, et al. Prevalence of Fracture and Fragment Embolization of the Bard Recovery and Bard G2 Cava Filters and Clinical Implications Including Cardiac Perforation and Tamponade. *Arch. Int. Med. 2010* Nov.; 170:1827-31.

59.     When such failures occur, shards of the device, or the entire device, can travel to the heart (as in this case), where it can cause cardiac tamponade, perforation of the atrial wall, myocardial infarction, and death. Fractured shards may also become deeply embedded in tissue, or may migrate to the heart and lungs, where the shards are too dangerous to remove. Such patients face a lifetime of future risks due to the high failure and complication rates with this device.

60.     The Recovery Filter similarly poses a high risk of tilting and then perforating the vena cava walls. When such failures occur, the device can also perforate the aorta, duodenum, small bowel, ureter, pancreas, spine, and other organs / structures / vessels -- which may lead to numerous significant problems including death. Further,

given the risk of injury in attempting to remove filters that have perforated the vena cava, the device may be irremovable. Thus, these patients face not only an irreparable injury, but also a lifetime of future additional risk due to the high failure and complication rates with this device.

61.     Instead of pulling the Recovery filter off the market, Bard focused on public relations and protecting its brand and image. By February 12, 2004, Bard had formed a crisis communication team and drafted at least four communiques to pass onto its sales force containing false information designed to be relayed to concerned doctors.

62.     By April of 2004, at least three deaths had been reported to Bard. Yet again, instead of recalling its deadly device, Bard concealed this information from doctors and patients and hired the public relations firm, Hill & Knowlton, to address anticipated publicity that could affect stock prices and sales.

63.     Bard made the decision to continue to market and sell the Recovery filter until its next generation product, the G2 IVC filter, was cleared by the FDA.

64.     The G2 filter, however, was not cleared for market until August 29, 2005.

65.     Meanwhile, the death count escalated.

66.     On July 12, 2004, C.R. Bard CEO Timothy Ring received an executive summary reporting that there were at least 12 filter migrations resulting in four deaths and at least 17 reports of filter fracture, six cases of which involved strut embolization to the heart.

67.     This same report advised that fracture rates for the Recovery filter exceed reported rates of other filters.

68.     These events revealed, or should have revealed, to Bard that the Recovery filter is prone to an unreasonably high risk of failure and patient injury following placement in the human body.

69.     Bard also learned that the Recovery filter failed to meet migration resistance testing specifications.

70.     Bard also manipulated migration resistance testing to increase the temperature above normal body temperature because this artificially improved the

migration resistance results.

71.     In addition, multiple early studies reported that the Recovery filter has a fracture and migration rate ranging from 21% to 50%, rates that are substantially higher compared to other IVC filters. More recently, fractures were reported to be as high as 40% after five and a half years from the date of implant.

72.     Bard had clear evidence that the Recovery filter was not substantially equivalent to the predecessor SNF, making the Recovery filter adulterated and misbranded, requiring its immediate withdrawal from the market.

73.     At least one Bard executive concluded the Recovery filter posed an unreasonable risk of harm and required corrective action, including a recall.

74.     Likewise, Bard's G2 filter was predicted to have fracture rates as high as 37.5% after five years from date of implant.

75.     Subsequent Bard IVC Filter models, including the electropolished version of the G2 filter, known as the Eclipse, only marginally increased fracture resistance.

76.     The Recovery filter's failures described above occur at a substantially higher rate than with other IVC filters.

77.     The adverse event reports (AERs) associated with IVC filter devices demonstrate that Bard's IVC filters are far more prone to failure than other similar devices. A review of the FDA MAUDE database from the years 2004-2008 reveals data establishing that Bard's IVC filters are responsible for the following percentages of all AERs:

     a.  50% of all adverse events;

     b.  64% of all occurrences of device migration;

     c.  69% of all occurrences of vena cava wall perforation; and

     d.  70% of all occurrences of filter fracture.

78.     These failures are attributable, in part, to the fact that the Recovery filter was not adequately designed to be able to withstand the normal anatomical and physiological loading cycles exerted *in vivo*.

79.     In addition to design defects, the Recovery filter suffers from

manufacturing defects that include, but are not limited to, the existence of "draw markings" and circumferential grinding markings on the device's exterior surface. The presence of these draw markings and/or circumferential grinding markings further compromises the structural integrity of the device *in vivo*. In particular, the Recovery filter is prone to fail at or near the location of draw markings/circumferential grinding markings on the struts of the device. Put simply, the presence of these exterior manufacturing defects makes the Recovery filter more susceptible to failure because it is too weak to withstand normal placement within the human body.

80. Bard knew that no clinical testing, such as animal studies or simulated use tests, was conducted to determine if the Recovery filter would perform safely once implanted in the human body and subjected to normal *in vivo* stresses.

81. Soon after the Recovery filter's introduction to the market in 2003, Bard began receiving large numbers of AERs from healthcare providers reporting that the Recovery filter was fracturing post-implantation and that fractured pieces and/or entire devices were migrating throughout the human body, including to the heart and lungs. Bard also received large numbers of AERs reporting that the Recovery filter was found to have excessively tilted and/or perforated the inferior vena cava post-implantation. These failures were often associated with reports of severe patient injuries, such as:

   a. Death;

   b. Hemorrhage

   c. Cardiac/pericardial tamponade (pressure caused by a collection of blood in the area around the heart);

   d. Cardiac arrhythmia and other symptoms similar to myocardial infarction;

   e. Severe and persistent pain;

   f. Thrombosis and occlusion of the IVC; and

   g. Perforations of tissue, vessels and organs.

82. Within the first year of full market release of the Recovery filter, Bard and BPV received at least 32 AERs reporting that the Recovery Filter had fractured *in vivo*, and at least 22 AERs reporting that the entire device had migrated *in vivo*. Of the 22

reported migration failures, at least nine (9) were reported to have been associated with a patient death.

83.  Bard was aware that Bard IVC Filters had substantially higher reported failure rates than all other IVC filters for fracture, perforation, migration, and death. For example:

a.  On April 23, 2004, Bard's Corporate VP of Quality Assurance sent an e-mail noting that the Recovery filter's reported failure rates "did not look good compared to permanent filters" and promised to remove the filter from the market if its reported death rate became "significantly greater than the rest of the pack."

b.  On July 9, 2004, a BPV safety analysis of reported failure rates determined that the Recovery filter had a reported failure rate that was 28 times higher than all other IVC filters.

c.  On December 17, 2004, analysis determined that the "[r]eports of death, filter migration (movement), IVC perforation, and filter fracture associated with the Recovery filter were seen in the MAUDE database at reporting rates that were 4.6, 4.4, 4.1, and 5.3 times higher, respectively, than reporting rates for all other filters. . . . These deficiencies were all statistically significant . . . [and were] significantly higher than those for other removable filters."

d.  By December 2004, according to BPV's own findings pursuant to its safety procedure, the Recovery filter had so many reported failures that it was deemed not reasonably safe for human use and required "correction."

e.  A BPV safety analysis from June 28, 2011 revealed that the Recovery filter had a reported fracture rate 55 times higher than the SNF.

f.  Whereas the Recovery filter was reported to have caused over a dozen deaths by early 2005, the SNF has never — to Plaintiff's knowledge — been reported as associated with a patient death.

84.  From 2003 through September 2005, Bard received ever-growing numbers

of AERs reporting the above-described failures and patient injuries. Bard knew or should have known that the failure rates associated with the Recovery filter were substantially higher than other similar products on the market, yet Bard failed to warn consumers of this unreasonably dangerous device.

85.     Bard began investigating these failures in 2004, creating Failure Investigation Reports and Remedial Action Plans, but each time Bard reviewed a migration, fracture, or death, it was unable to determine the root cause. Thus, it never understood how or why these failures were happening.

### Bard Knew Why the Recovery Filter Was Failing and Was Aware of Available Design Changes that Could Substantially Reduce Failures

86.     Bard knew why the design changes made to the Recovery filter were causing failures.

87.     Bard was aware that the diameter of the leg hooks was a substantial factor in a filter's ability to resist migration and fatigue.

88.     By reducing the diameter of the hooks on the Recovery filter, Bard had reduced the device's ability to remain stable and not fracture.

89.     Bard also reduced the leg span of the Recovery filter from that of the SNF filter by 25%. As a result, Bard knew its retrievable IVC filters lacked a sufficient margin of safety to accommodate expansion of the vena cava (distension) after placement.

90.     Bard was also aware that its failure to electropolish the wire material prior to distribution meant that Bard IVC Filters had surface damage that reduced their fatigue resistance.

91.     Bard was also aware that the Recovery filter had a high propensity to tilt and perforate the vena cava, which substantially increased the risk of fracture.

92.     Bard was also aware that fatigue resistance could be increased by decreasing the sharpness of the angle of the wire struts where they exited the cap at the top of the IVC filters, and by chamfering (rounding or reducing the sharpness) of the cap edge against which the struts rubbed.

93.     A few examples of Bard's awareness of the unreasonably dangerous problems with Bard IVC Filters include:

a. On June 18, 2003, BPV engineer Robert Carr sent an e-mail noting that chamfering the edge of the cap would reduce the likelihood of fracture.

b. On March 16, 2004, a BPV engineer sent an e-mail admitting that the surface damage seen on the Recovery filter from the manufacturing process decreases fatigue resistance and that electropolishing increases fatigue resistance.

c. In an April 2004 meeting, BPV was warned by its physician consultants, Drs. Venbrux and Kaufman, that the migration resistance of the Recovery filter needed to be raised from 50 mmHg to 140 mmHg. They further warned BPV that Bard's Recovery filter was a "wimpy" filter and its radial force was inadequate to assure stability.

d. On May 5, 2004, a BPV engineer sent an e-mail stating that adding a "chamfer" to the filter would "address the arm fracture issue."

e. On May 26, 2004, a BPV engineer sent an e-mail stating that a proposed modified Recovery filter design with a large chamfer lasted 50 bending cycles before breaking, whereas another proposed modified Recovery filter with a small chamfer broke after ten bending cycles.

f. Bard's bench testing (particularly as to fracture and migration) showed that the Recovery Filter was unable to withstand forces anticipated in the human body and that it was substantially likely to tilt, perforate, migrate, and fracture in patients.

94.     Prior to Plaintiff being implanted with a Bard IVC Filter, Bard was aware of other design changes that could make the Recovery filter substantially safer. In a report dated February 16, 2005, BPV describes the design changes to the Recovery filter, which became known as the G2 Filter. The report states that the Recovery filter has been modified to "to increase migration and fracture resistance, and to minimize the likelihood of leg twisting, appendage snagging, filter tilting, and caval perforation." The document goes on to describe the design modifications, which include:

a. Increased ground wire diameter of the hook from .0085" to .0105" in order

to improve the fracture resistance of the hook and to improve the migration resistance of the filter.

b.   The leg span has been increased from 32mm to 40mm in order to improve the ability of the filter to expand with a distending vena cava reducing risk of migration.

c.   The total filter arm length has increased from 20mm to 25mm, enlarging the arm span from 30mm to 33mm to aid in filter centering.

d.   An additional inward bend has been applied to the end of the filter arm in order to improve arm interaction with the vessel wall and to address caval perforations and appendage snagging.

e.   The arc of filter arm, as it attaches to the sleeve, has been modified to have a smooth radial transition instead of sharp angle. This change was made in order to reduce the stress concentration generated by the sharp angle and thus improve fracture resistance in the area of the filter.

f.   The report concludes that the design modifications have substantially reduced the risk of fracture.

95.   Subsequent design changes only marginally improved product safety but did not fully or adequately address the Bard IVC Filters' deadly defects.

96.   Electropolishing was added to the Bard IVC Filters in 2010 to reduce the risk of fracture. Electropolishing implanted Nitinol IVC filters was the industry standard, and increased fatigue resistance by at least 25%, according to Bard's internal testing.

97.   Additional anchors were added to the anchoring system on the filter in 2011, in what became known as the Meridian filter. The purpose of this improvement was to decrease the risk of tilting, which increases the risk of fracture and perforation, and reduce caudal migration.

98.   Bard added penetration limiters with the introduction of Denali Filter in May 2013.

99.   Penetration limiters are designed to reduce perforation and penetration of the vena cava.

**Bard Misrepresented and Concealed the IVC Filters' Risks and Benefits**

100.     Despite knowing that the Recovery filter was substantially more likely to fracture, migrate, tilt, and cause death than any other filter, Bard marketed its IVC filters as safer and more effective than all other filters, including throughout the lifecycle of the product.

101.     Bard further provided mandatory scripts to its Bard IVC filter sales force, which required the sales force to falsely tell physicians that the Recovery filter was safe because it had the same reported failure rates as all other filters.

102.     The Crisis Communication Team created a Crisis Communication Plan, which summarized Bard's motivation for withholding risk information from the public as follows:

> The proliferation of unfavorable press in top-tier media outlets can cause an onslaught of negative activity: a company's employee morale may suffer, stock prices may plummet, analysts may downgrade the affected company's rating, reputations may be ruined temporarily or even permanently. Extensive preparation is critical to help prevent the spread of damaging coverage.

103.     In an April 2004 e-mail, BPV consultant Dr. John Lehmann, a member of the Crisis Communication Team, advised Bard to conceal from the public Bard's information about the material risk of its IVC filters. Bard adopted his advice. His e-mail states, among other things:

> Comparison with other filters is problematic in many ways, and we should avoid/downplay this as much as possible. When pressed, we simply paraphrase what was said in the Health Hazard. That "Estimates based on available data suggest that there is no significant difference in the rates of these complications between any of the IVC Filters currently marketed in the U.S., including the Recovery IVC Filters.
>
> ***
>
> I wouldn't raise this subject if at possible. It would be a most unusual reporter that will get this far. The testing data I saw in Arizona showed that although RF was certainly within the boundaries of IVC Filters tested, in larger veins it was near the bottom. I would avoid as much as possible getting into this subject, because I'm not sure others would agree with the conclusion that Recovery Vena Cava Filter was just as or

more resistant to migration than all retrievable and non-retrievable competitors.

104.     Bard also made false representations and/omissions to the BPV sales force to keep them selling the IVC filters. Bard reassured the sales force that despite the failures with the Recovery filter, the Bard IVC Filters were safe because they had the same failure rates as all other IVC filters.

105.     By December 2004, BPV's own safety procedure deemed the Recovery filter not reasonably safe for human use. Yet, Bard continued to market and sell the Recovery filter into September 2005 and continued to allow its defective product to sit on shelves available to be implanted for an unknown period of time after September 2005.

106.     Even after the G2 filter was launched in September 2005, Bard still failed to warn consumers of the increased risk posed by the Recovery filter. Instead, Bard again chose to conceal information about the serious risks of substantial harm from the use of its defective product.

107.     Even Bard's updated labeling in December 2004 downplayed and concealed the Recovery filter's dangerous effects, suggesting that fractures almost always cause no harm and that all filters had the same risk of failure.

108.     Bard's updated labeling also downplayed the risk of harm by stating that serious injuries had only been "reported" when Bard knew such injuries had in fact occurred.

109.     Nonetheless, in late 2004 or early 2005 Bard, without knowing why the failures were happening (and thus what design changes were necessary to prevent them) and without notifying consumers of the design and manufacturing flaws inherent in the Recovery filter, began to make design changes to the Recovery in an attempt to correct its flaws. But, as with its initial design of the Recovery filter, Bard failed to appreciate how the failures were caused and how to create a design to reduce or eliminate them. Further, Bard again failed to adequately test the remodeled Recovery to ensure that it was safe for permanent implantation.

**The G2 Filter**

110.     In 2005, Bard made several design changes to its first-generation

retrievable filter, Recovery Filter, in an attempt to fix its design flaws. The second-generation Recovery filter is called the G2.

111.  As with the Recovery filter, Bard's design and testing of the G2 was significantly inadequate. For example, Bard substantially widened the base of the filter. This change was an immediate and reactionary response to the migrations of the Recovery filter to patients' hearts and related deaths. But, Bard failed to do any testing to determine what impact that change would have on the filter's safety and performance. Particularly, Bard failed to test to determine if the change would impact the filter's likelihood of tilting, perforating the IVC, or fracturing. Similarly, it again failed to test to determine how the filter would perform under foreseeable worst-case conditions.

112.  And, when the filter failed some of Bard's internal test standards, including that it perform as well as or better than the SNF, Bard lowered the standard (to be better than the poor performing Recovery) rather than fix the issue and improve the G2's actual performance.

113.  Even though the new G2 design was faulty, Bard learned that it reduced the risk that the filter would migrate to a patient's heart.

114.  Bard further claimed that the redesigned G2 Bard had "enhanced fracture resistance," improved centering," and "increased migration resistance."

115.  Bard did not have data proving these claims.

116.  Bard also did not conduct adequate clinical and bench testing to ensure that the G2 filter would perform safely and effectively once implanted in the human body.

117.  Although Bard considered various methods for reducing this risk in patients who had already received a Recovery filter (Bard considered a recall, warning doctors to bring patients back to retrieve and replace Recovery filters, a registry, and periodic monitoring), Bard did none of these things, consciously disregarding a substantial risk of injury.

118.  Bard predicted that a substantial number of Recovery patients would experience a filter failure after it stopped selling the device but decided not to do anything about it.

119.     Bard's redesign of the Recovery filter by creating the G2, and its switch from marketing the Recovery to the G2 filter, fell under the FDA definition of a recall.

120.     Bard did not notify the FDA or doctors that it was conducting a "silent" recall of the Recovery filter. Instead, Bard offered to buy back Recovery devices that had not yet been implanted, but only if doctors requested it.

121.     In other words, Bard explicitly prioritized profits over patient safety.

122.     As with the Recovery filter, Bard and BPV immediately began receiving large numbers of reports that the G2 filter was, inter alia, fracturing, migrating, excessively tilting, and perforating the vena cava once implanted.

123.     These failures were again often associated with reports of severe patient injuries such death; hemorrhage; cardiac/pericardial tamponade (pressure caused by a collection of blood in the area around the heart); cardiac arrhythmia and other symptoms similar to myocardial infarction; severe and persistent pain; and perforations of tissue, vessels and organs.

124.     Defendants Bard and BPV represent the fracture rate of the G2 filter to be 1.2%. Based upon a review of the data available in the public domain (including the FDA MAUDE database statistics and the published medical literature), this representation does not accurately reflect the true incidence of device fracture for the G2 filter.

125.     The G2 filter fracture rate increases dramatically with indwell time.

126.     Bard determined that the G2 migration rate was "unacceptable."

127.     On December 27, 2005, Bard's Medical Affairs Director sent an e-mail questioning why Bard was even selling the modified version of the Recovery filter, when Bard's SNF had virtually no complaints associated with it.

128.     Bard determined that the G2 migrated and fractured more often than the Recovery filter, the SNF filter, and competitor filters.

129.     A review of the MAUDE database from the years 2004-2008 reveals data to establish that the Bard and BPV's vena cava filters (including the G2 filter) are responsible for the majority of all reported adverse events related to inferior

vena cava filters.

130.   Bard did not disclose any of this information to the FDA or doctors.

131.   Also, like its predecessor, in addition to design defects, the G2 filter suffered from manufacturing defects. These manufacturing defects include, but are not limited to, the existence of "draw markings" and circumferential grinding markings on the exterior of the surface of the device.

132.   The presence of these draw markings and/or circumferential grinding markings further compromises the structural integrity of the G2 filter while in vivo. In particular, the G2 filter is prone to fail at or near the location of draw markings/circumferential grinding markings on the struts of the device.

133.   Put simply, the G2 filter is not of sufficient strength to withstand normal placement within the human body. The presence of the aforementioned exterior manufacturing defects makes the device more susceptible to fatigue failure and migration.

134.   Thus, the G2 filter shares similar defects and health risks as its predicate device.

## The Eclipse Filter

135.   In a failed effort to resolve the complications associated with its previous filters, Bard designed the Eclipse Filter as the next generation in its retrievable IVC filter family.

136.   The Eclipse filter was cleared by the FDA on January 14, 2010. The only design changes from the G2 family of filters to the Eclipse filter was that the Eclipse filter was electropolished.

137.   According to Bard's internal testing, electropolishing supposedly increased fracture resistance by 25%. However, longitudinal studies published in peer-reviewed medical literature found that among 363 patients implanted with the Recovery filter and 658 patients implanted with the G2 filter, the devices experienced fracture rates of 40% and 37.5%, respectively, after five and a half years. Thus, approximately 28.125% to 30% of Eclipse filters would still be projected to fracture within five and a half years.

138.   Without meaningful design changes, the Eclipse filter continued to share several of the same design defects and complications associated with the Recovery filter and G2 family of filters.

139.   Soon after Bard launched the Eclipse filter, it began receiving complaints and reports of injuries associated with the Eclipse filter similar to those received with its predecessor filters.

140.   Bard, however, knew and/or soon learned that the Eclipse filter was not the substantial equivalent of the SNF, making this device also misbranded and adulterated, and subject to recall.

### The Meridian Filter

141.   The Meridian filter was cleared by the FDA in August of 2011.

142.   Bard represented to the FDA that the Meridian was substantially similar to the Eclipse filter and could therefore be cleared via the less onerous 510(k) process.

143.   Bard, however, knew and/or soon learned that the Meridian filter was not the substantial equivalent of the SNF, making this device also misbranded and adulterated, and subject to recall.

144.   The design of the Meridian is based on the Eclipse filter, which, in turn, is based entirely on the G2 filter, which, in turn is based on the Recovery Filter. Like the Eclipse, the wires used in the Meridian filter are electropolished prior to the forming of the filter. The only added feature to the Meridian filter was a caudal anchoring system added in an attempt to reduce the prevalence of the filter caudal migrating toward the groin.

145.   However, as seen with the Recovery, G2, and Eclipse filters, soon after its introduction to the market reports surfaced that the Meridian filters were fracturing, perforating, migrating, and/or tilting in the patients in which they were implanted.

146.   The Meridian filter was also plagued with the same manufacturing and design defects that were causing damage to the general public as Bard's predecessor retrievable filters.

**The Denali Filter**

147.    The Denali filter was cleared by the FDA on May 15, 2013. It is Bard's latest generation device in the IVC filter product line.

148.    Bard represented to the FDA that the Denali was substantially similar to the Eclipse filter, again bypassing formal pre-market FDA approval and instead utilizing the 510(k) process.

149.    Its design is based on the Eclipse filter, which in turn, was based on Bard's predecessor filter line.

150.    The added features to the Denali Filter were cranial and caudal anchoring systems (to reduce the prevalence of the filter migration) and penetration limiters.

151.    However, as seen with the Recovery, G2, G2X (G2 Express), and Eclipse Filters, soon after its introduction to the market, reports were made that the Denali filters were fracturing, perforating, migrating, and/or tilting in the patients in which they were implanted.

152.    The Denali filter was likewise plagued with the same manufacturing and design defects that were causing damage to the general public in Bard's predecessor retrievable filter family.

153.    At the May 17, 2013 launch of the Denali filter, Bard predicted that the possible failure rates for migrations in the Denali filter were greater than or equal to the possible failure rates for migrations in the SNF.

154.    At launch, Bard predicted that the possible failure rates for penetrations and perforations of the caval wall in the Denali filter were greater than or equal to the possible failure rates for penetrations and perforations of the caval wall in the SNF.

155.    At launch, Bard predicted the Denali filter would perforate the caval wall due to "Excessive radial force (e.g. Nitinol properties)" resulting in a Critical health hazard 1 to 15 times more frequently the SNF.

156.    At launch, Bard predicted the Denali filter would fracture due to "Material fatigue due to movement against osteophyte of a vertebra an IVC side branch vessel, or some other anatomical anomaly" resulting in Major dissatisfaction 2 to 10 times more

frequently than it predicted the SNF would.

157.   By 2014, the Denali filter was fracturing more than twice as often as the SNF filter, per unit sold.

158.   At all times material hereto from the design phase, testing, and manufacture of the Recovery filter through the Denali filter, Bard lacked a thorough understanding dynamics of caval anatomy that impacted testing methods.

159.   At this time, all Bard IVC Filters contain the same or substantially similar defects resulting in the same or substantially similar mechanism of injury to Plaintiffs and their decedents.

160.   At this time, all Bard IVC Filters are misbranded and adulterated by virtue of them failing to be the substantial equivalent of their predecessor devices, all of which were required to be as safe and effective as the original predicate device, the Simon Nitinol Filter, and none were/are, making them subject to corrective action, including recall, in the interest of patient safety. The use of each of these subject devices was inappropriate and illegal since each was being marketed while adulterated and misbranded for failing, among other things, to be as safe and effective as the originating predicate device, SNF.

161.   At all relevant times, safer and more efficacious designs existed for this product, as well as reasonable treatment alternatives.

**Estoppel from Pleading Statutes of Limitations or Repose**

162.   Plaintiff incorporates by reference all prior allegations.

163.   Plaintiff is within the applicable statute of limitations for Plaintiff's claims because Plaintiff, Decedent (and Decedent's healthcare professionals) did not discover, and could not reasonably discover, the defects and unreasonably dangerous condition of their Bard IVC Filters.

164.   Plaintiff's and Decedent's ignorance of the defective and unreasonably dangerous nature of the Bard IVC Filters, and the causal connection between these defects and Plaintiff's injuries and damages, is due to Bard's acts and omissions in fraudulently concealing information from the public and misrepresenting and/or

downplaying the serious threat to public safety its products presented, and continue to present.

165.    In addition, Bard is estopped from relying on any statutes of limitation or repose by virtue of its unclean hands, acts of fraudulent concealment, affirmative misrepresentations and omissions, and failing to timely disclose the unreasonably dangerous and defective nature of Bard's IVC filter product and facts that would have alerted Plaintiff of an injury and that the injury was attributable to the Filter and the fault of another.

166.    Such conduct includes intentional concealment from Plaintiff, Decedent, and Decedent's health care professionals, and the general consuming public of material information that Bard IVC Filters had not been demonstrated to be safe or effective, and carried with them the risks and dangerous defects described above.

167.    Plaintiff and Decedent reasonably relied on Defendants' representations and misrepresentations, which caused delay in learning the true facts related to this case, and therefore a reasonable delay in filing this action.

168.    Bard had a duty to disclose the fact that Bard IVC Filters are not safe or effective, not as safe as other filters on the market, defective, and unreasonably dangerous, and that their implantation and use carried with it the serious risk of developing perforation, migration, tilting, and/or fracture.

**Specific Factual Allegations as to Decedent**

169.    On July 7, 2017, Decedent underwent placement of a Denali IVC filter. The Filter subsequently malfunctioned by perforating the IVC, causing a thrombus, retroperitoneal hemorrhage, and cardiac arrest. The filter caused his death on January 25, 2020. As a result, Decedent suffered pain, emotional distress, and loss of enjoyment of life, and death.

170.    The Filter was designed, manufactured, prepared, compounded, assembled, processed, marketed, distributed, and sold by Bard.

171.    As a direct and proximate result, Plaintiff has incurred significant medical expenses, and has endured pain and suffering, anxiety, lost enjoyment of life, and other

losses, some of which are permanent.

## FIRST CAUSE OF ACTION
### [Massachusetts Consumer Protection Procedures Act]

172.   Plaintiff incorporates by reference all preceding paragraphs, which provide a basis for Plaintiff to assert a claim under Massachusetts Consumer Protection law, Massachusetts General Laws Chapter 93A. Defendants engaged in conduct in violation of the Act.

173.   Decedent was in the class of persons the Act was and is designed to protect.

174.   As a result of Defendants' violations of the Act, Decedent suffered injuries and damages.

175.   Prior to, on, and after the date the Filter was implanted in Decedent and at all relevant times, Defendants designed, distributed, manufactured, sold, and marketed the Filter for use in the United States.

176.   At all times herein mentioned, Defendants designed, distributed, manufactured, marketed, and sold the Filter such that it was dangerous, unsafe, and defective due to its design, manufacture, and lack of adequate warnings.

177.   The Filter contained all of these defects when it left Defendants' possession.

178.   At the time of the events set forth herein, the Subject IVC Filter was expected to and did reach the Decedent without substantial change in the condition in which the product was sold by the Defendants.

179.   The Filter contained a manufacturing defect in that it differed from the manufacturer's design or specifications, or from other typical units of the same product line.

180.   Prior to the dates on which the Filter was implanted in Decedent, Defendants manufactured, distributed, and sold the Filter.

181.   The Filter had potential risks and side effects that were known or knowable to Defendants by the use of scientific knowledge available before, at, and after the manufacture, distribution, and sale of the Filter.

182.   Defendants knew or should have known of the defective condition,

characteristics, and risks associated with the Filter, as previously set forth herein.

183.    The defective conditions included, but were not limited to, the Filter posing a significant and higher risk of device failure (e.g., fracture, migration, tilting, extreme clotting and thrombosis, and perforation of the vena cava wall) than other similar devices, resulting in death and/or serious injuries, and that certain conditions or post-implant procedures (e.g., morbid obesity or open abdominal procedures), could affect the safety and integrity of the device, among other things.

184.    The Filter was in a defective condition that was unreasonably and substantially dangerous to any user or ordinary consumer such as Decedent who was implanted with the Filter, when it was used in an intended or reasonably foreseeable way.

185.    Such ordinary consumers, including Decedent, would not and could not have recognized or discovered the potential risks and side effects of the Filter, as set forth herein.

186.    The warnings and directions provided with the Filter by Defendants failed to adequately warn of the Filter's potential risks and side effects, which were known or were reasonably scientifically knowable to Defendants, but not known or recognizable to ordinary consumers, such as Decedent or his treating doctors.

187.    The Filter was expected to and did reach Decedent without substantial change in its condition, labeling, or warnings as manufactured, distributed, and sold by Defendants.

188.    Decedent and Decedent's physicians used the Filter in the manner in which it was intended to be used, making such use reasonably foreseeable to Defendants.

189.    Defendants' lack of sufficient instructions or warnings prior to, on, and after the date Decedent was implanted with the Filter was a substantial factor in causing Decedent's injuries and damages.

190.    Defendants more specifically violated the Act as follows:

   a.   Defendants represented that the Filter had approval, characteristics, uses, and/or benefits that it did not;

   b.   Defendants represented that the Filter was of a particular standard, quality,

and/or grade that it was not;

    c.   Defendants made material misrepresentations regarding the Filter that had a tendency to, and did, mislead consumers, including Decedent;

    d.   Defendants failed to state material facts about the Filter, the omissions of which had a tendency to, and did, mislead consumers, including Decedent;

    e.   Defendants used innuendo or ambiguity as to a material fact, which had a tendency to, and did mislead, consumers, including Decedent;

    f.   Defendants marketed/advertised the Filter without the intent to sell it as marketed/advertised.

    g.   Defendants knew, at the time the Filter was sold, that the Filter lacked substantial benefits and, specifically, that the Filter had not been subjected to sufficient safety or efficacy testing;

    h.   Defendants offered for sale, and distributed, the Filter, which was not in conformity with applicable consumer product safety standards.

191.   Defendants' acts and/or omissions, in violation of the Act, were a substantial factor in causing Decedent's injuries and damages.

192.   Defendants' acts and/or omissions, in violation of the Act, proximately caused Decedent's injuries and damages as herein described.

## SECOND CAUSE OF ACTION
### [Negligence—Design, Manufacture, Sale]

193.   Plaintiff incorporates by reference all preceding paragraphs.

194.   Prior to, on, and after the date the Filter was implanted in Decedent, and at all relevant times, Defendants designed, tested, distributed, manufactured, advertised, sold, and marketed the Filter for use by consumers, such as Decedent, in the United States.

195.   Prior to, on, and after the date the Filter was implanted in Decedent, Defendants had a duty to exercise due care and avoid unreasonable risk of harm in and about their design, testing, distribution, manufacture, advertising, sale, and marketing of the Filter.

196.   At the time of design, distribution, manufacture, advertising, sale,

marketing, and implantation of the Filter in Decedent, Defendants were aware of the following facts:

    a.  The Filter was designed and manufactured in such a manner so as to present an unreasonable risk of fracture of portions of the Filter;

    b.  The Filter was designed and manufactured so as to present an unreasonable risk of migration of the device and/or portions of the device;

    c.  The Filter was designed and manufactured so as to present an unreasonable risk of the device tilting and/or perforating the vena cava wall;

    d.  The Filter was designed and manufactured so as to have unreasonable and insufficient strength or structural integrity to withstand normal placement within the human body;

    e.  The Filter was designed and manufactured so as to present an unreasonable risk of extreme clotting and IVC thrombosis;

    f.  The Filter would be used without inspection for defects;

    g.  The Filter would be used by patients with special medical conditions such as those of Decedent; and

    h.  The Filter had previously caused serious bodily injury to its users with special medical conditions such as those of Decedent.

197.   Prior to and on the date of Decedent's implantation with the Filter, Defendants breached their duty of care by, but not limited to, the following:

    a.  Designing and distributing a product in which they knew or should have known that the likelihood and severity of potential harm from the product exceeded the burden of taking safety measures to reduce or avoid harm;

    b.  Designing and distributing a product in which they knew or should have known that the likelihood and severity of potential harm from the product exceeded the likelihood of potential harm from other devices available for the same purpose;

    c.  Failing to use reasonable care in manufacturing the product and producing a product that differed from their design or specifications or from other

typical units from the same production line;

d.  Failing to use reasonable care to warn or instruct Decedent, Decedent's physicians, or the general healthcare community about the Filter's substantially dangerous condition or about facts making the product likely to be dangerous;

e.  Failing to perform reasonable pre- and post-market testing of the Filter to determine whether or not the product was safe for its intended use;

f.  Failing to provide adequate instructions, guidelines, and safety precautions to those persons whom it was reasonably foreseeable would prescribe, use, and implant the Filter;

g.  Advertising, marketing, and recommending the use of the Filter, while concealing and failing to disclose or to warn of the dangers known by Defendants to be connected with and inherent in the use of the Filter;

h.  Representing that the Filter was safe for its intended use when, in fact, Defendants knew or should have known it was not safe for its intended purpose;

i.  Continuing manufacture and sale of the Filter with the knowledge that it was dangerous and not reasonably safe, and failing to comply with FDA good manufacturing regulations and policy;

j.  Failing to use reasonable and prudent care in the design, research, manufacture, and development of the Filter so as to avoid the risk of serious harm associated with its use;

k.  Advertising, marketing, promoting and selling the Filter for uses other than as approved and indicated in its label;

l.  Failing to establish an adequate quality assurance program used in the manufacturing of the Filter; and

m.  Failing to perform adequate evaluation and testing of the Filter where such evaluation and testing would have revealed its propensity to cause injuries and death as described herein.

198.    Defendants' conduct also violated Federal and other laws, regulations, and policies, all of which were designed to protect consumers like Decedent.

199.    These laws include, without limitation, 18 U.S.C. §§ 2, 1001, 333(b), and 1341; 21 U.S.C. §331(a).

200.    Defendants' violation of these safety statutes proscribing specific conduct constitutes negligence per se.

201.    As a direct and legal result of the above-described negligence in design, testing, distribution, manufacture, advertising, sales, and marketing, Decedent sustained the injuries and damages described above.

### THIRD CAUSE OF ACTION
### [Negligence—Failure to Recall/Retrofit]

202.    Plaintiff incorporates by reference all preceding paragraphs.

203.    Prior to, on, and after the date of Decedent's implantation with the Filter, and at all relevant times, Defendants designed, distributed, manufactured, sold, and marketed the Filter for use by consumers such as Decedent in the United States.

204.    Prior to, on, and after the date of Decedent's implantation with the Filter, and at all relevant times, Defendants knew or reasonably should have known that the Filter and its warnings were dangerous or were likely to be dangerous when used in a reasonably foreseeable manner.

205.    Prior to, on, and after the date of Decedent's implantation with the Filter, and at all relevant times, Defendants became aware that the defects of the Filter resulted in the Filter causing injuries similar to those Decedent suffered.

206.    Reasonable manufacturers and distributors under the same or similar circumstances would have recalled or retrofitted Bard IVC Filters and would thereby have avoided and prevented harm to many patients, including Decedent.

207.    In light of this information and Bard's knowledge described above, Bard had a duty to recall and/or retrofit Bard IVC Filters.

208.    Defendants negligently and carelessly failed to recall, to retrofit, or to warn patients or physicians about the danger of the Filter prior to, on, and after the date of

Decedent's implantation with the Filter, and continue to fail to recall the device up until the present time.

209.    As a direct and legal result of the above-described negligent failure to recall or retrofit the Filter, Decedent suffered the injuries described above.

## FOURTH CAUSE OF ACTION
### [Negligence—Failure to Warn]

210.    Plaintiff incorporates by reference all preceding paragraphs.

211.    Prior to, on, and after the date of Decedent's implantation with the Filter, and at all relevant times, Defendants designed, distributed, manufactured, sold, and marketed the Filter for use by consumers, such as Decedent, in the United States.

212.    Prior to, on, and after the date of Decedent's implantation with the Filter, and at all relevant times, Defendants knew or should have known that the Filter was dangerous or was likely to be dangerous when used in a reasonably foreseeable manner. Such danger included the propensity of the Filter to cause injuries similar to those suffered by Decedent.

213.    Prior to, on, and after the date of Decedent's implantation with the Filter, Defendants knew or reasonably should have known that the users of the device, including Decedent and Decedent's physicians, would not realize the dangers presented by the Filter.

214.    Prior to, on, and after the date of Decedent's use of the Filter, Defendants negligently and carelessly failed to adequately warn of the dangers presented by the Filter and/or failed to instruct on the safe use of the Filter.

215.    Reasonable manufacturers and reasonable distributors, under the same or similar circumstances as those of Defendants prior to, on, and after the date of Decedent's use of the Filter, would have warned of the dangers presented by the Filter, or instructed on the safe use of the Filter.

216.    Prior to the date of Decedent's use of the Filter, the Filter had already caused numerous instances of injuries similar to those suffered by Decedent, as well as death. Defendants deliberately failed to warn of the Filter's increased propensity to cause

these serious complications, or of the signs and symptoms of these complications.

217.    As a direct and proximate result of Defendants' failure to warn, Decedent sustained the injuries and damages described above.

## FIFTH CAUSE OF ACTION
### [Negligence—Misrepresentation]

218.    Plaintiff incorporates by reference all preceding paragraphs.

219.    Prior to, on, and after the dates during which Decedent was implanted with the Filter, Defendants negligently and carelessly represented to Decedent, Decedent's physicians, and the general public that an important fact was true, namely that the Filter was safe, fit, and effective for use.

220.    Prior to, on, and after the dates during which Decedent purchased and used the Filter, said representations were not true, and there was no reasonable ground for believing them to be true at the times they were made.

221.    Bard, as medical device designer, manufacturer, seller, promoter and/or distributor, knew or should reasonably have known that health care professionals and consumers, in weighing the potential benefits and potential risks of prescribing or using Bard IVC Filters, would rely upon information disseminated and marketed by Bard to them regarding the Bard IVC Filters.

222.    Bard failed to exercise reasonable care to ensure that the information they disseminated to health care professionals and consumers concerning the properties and effects of Bard IVC Filters was accurate, complete, and not misleading and, as a result, disseminated information to health care professionals and consumers that was negligently and materially inaccurate, misleading, false, and unreasonably dangerous to consumers such as Plaintiff.

223.    Bard owed a duty in all of its undertakings, including the dissemination of information concerning its IVC filters, to exercise reasonable care to ensure that it did not in those undertakings create unreasonable risks of personal injury to others.

224.    Bard had a duty to promptly correct material misstatements it knew others were relying upon in making healthcare decisions.

225.   Prior to, on, and after the dates during which Decedent purchased and used the Filter, Defendants intended that Decedent, his treating physicians, and the general public would rely on said representations, which Decedent reasonably did.

226.   Bard failed in each of these duties by misrepresenting to Plaintiff and the medical community the safety and efficacy of Bard IVC Filters and failing to correct known misstatements and misrepresentations.

227.   As a direct and proximate result of Defendants' negligent misrepresentation, Decedent sustained the injuries and damages described above.

**SIXTH CAUSE OF ACTION**
**[Breach of Express Warranty]**

228.   Plaintiff incorporates by reference all preceding paragraphs.

229.   Prior to, on, and after the dates during which Decedent was implanted with the Filter, and at all relevant times, Defendants had knowledge of the purpose for which the Filter was to be used, and represented it to be in all respects safe, effective, and proper for such purpose.

230.   At the time and place of sale, distribution, and supply of Bard IVC Filters to Decedent (and to other consumer and the medical community), Bard expressly represented and warranted that Bard IVC Filters were safe; that they were well-tolerated, efficacious, fit for their intended purpose, and of marketable quality; that they did not produce any unwarned-of dangerous side effects; and that they were adequately tested.

231.   Said warranties and representations were made to consumers such as Decedent and his treating physicians.

232.   Decedent and his treating physicians relied on said warranties and representations in deciding to use the Filter.

233.   Defendants breached the above-described express warranties and representations in that the Filter did not conform to these express warranties and representations, as the Filter was and is not safe or effective and it produces serious side effects including, among other things, the injuries sustained by Decedent.

234.   Bard breached its expressed warranties, in that Bard IVC Filters:

a.  Were designed in such a manner so as to be prone to an unreasonably high incidence of fracture, perforation of vessels and organs, and/or migration;

b.  Were designed in such a manner so as to result in an unreasonably high incidence of injury to the vessels and organs of its purchaser;

c.  Were manufactured in such a manner that the exterior surface of the filter was inadequately, improperly, and inappropriately constituted, causing the device to weaken and fail;

d.  Were predicted by Bard to fail at much higher rates than represented by Bard or expected by the medical community and public, including Decedent and Decedent's physicians;

e.  Were unable to be removed at any time during a person's life;

f.  Were not efficacious in the prevention of pulmonary emboli;

g.  Carried a risk of use outweighed any benefit; and

h.  Were not self-centering.

235.  Prior to, on, and after the dates during which Decedent purchased and used the Filter, Defendants were put on notice of the Filter's inability to conform to these express warranties.

236.  As a direct and proximate cause of Defendants' breach of express warranty, Decedent sustained the injuries and damages described above.

## SEVENTH CAUSE OF ACTION
### [Breach of Implied Warranty of Fitness for Particular Purpose]

237.  Plaintiff incorporates by reference all preceding paragraphs.

238.  At all relevant times, Defendants were in the business of selling the Filter.

239.  At all relevant times, Defendants knew or had reason to know that Decedent intended to use the Filter for a particular purpose, namely prevention of injury caused by PE.

240.  Prior to, on, and after the dates during which Decedent purchased and was implanted with the Filter, Defendants knew or had reason to know that Decedent and his treating physicians were relying on their skill and judgment to select or to furnish medical

devices that were suitable for a relevant particular purpose, namely the prevention of injury caused by PE.

241.    Prior to, on, and after the dates during which Decedent purchased and was implanted with the Filter, Decedent and his treating physicians justifiably relied on Defendants' skill and judgment.

242.    Prior to, on, and after the dates during which Decedent purchased and was implanted with the Filter, it was in fact not suitable for the relevant particular purpose, namely prevention of injury caused by PE.

243.    Prior to, on, and after the dates during which Decedent purchased and was implanted with the Filter, Defendants were put on notice of the Filter's inability to conform to these warranties.

244.    Prior to, on, and after the dates during which Decedent purchased and was implanted with the Filter, Defendants were put on notice of the Filter's tendency to cause extreme clotting and IVC thrombosis – the very injury it was designed to prevent.

245.    As a direct and proximate cause of Defendants' breach of said implied warranty of fitness for a particular purpose, Decedent sustained the injuries and damages described above.

### EIGHTH CAUSE OF ACTION
**[Breach of Implied Warranty of Merchantability]**

246.    Plaintiff incorporates by reference all preceding paragraphs.

247.    Defendants breached implied warranties under M.G.L. Chapter 106, S.2-314.

248.    Prior to implantation with the Filter, Decedent purchased the Filter from Defendants.

249.    Prior to, on, and after the dates during which Decedent purchased and was implanted with the Filter, Defendants were in the business of selling medical devices such as IVC filters.

250.    Prior to, on, and after the dates during which Decedent purchased and was implanted with the Filter, it was not of the same quality as similar IVC filters generally

acceptable in the trade, not fit for the ordinary purpose for which such IVC filters are generally used, and did not conform to the quality established by the usage of the trade.

251.  Prior to, on, and after the dates during which Decedent purchased and was implanted with the Filter, Defendants were put on notice of its inability to conform to these warranties.

252.  As a direct and proximate result of Defendants' breach of said implied warranty of merchantability, Decedent sustained the injuries and damages described above.

## NINTH CAUSE OF ACTION
### [Fraud—Misrepresentation]

253.  Plaintiff incorporates by reference all preceding paragraphs.

254.  At all times relevant to this cause, and as detailed above, Defendants intentionally provided Decedent, Decedent's physicians, the medical community, and the public at large, with false or inaccurate information, and/or omitted material information concerning the Filter, including, but not limited to, misrepresentations regarding the Filter's safety, efficacy, failure rate, and approved uses.

255.  The information distributed by Defendants (as well as through their officers, directors, agents, and representatives) to the public, the medical community, and Decedent was in the form of reports, press releases, advertising campaigns, labeling materials, print advertisements, and commercial media containing material representations and instructions for use.

256.  These materials contained false and misleading material representations, which included: that the Filter was safe and fit when used for its intended purpose or in a reasonably foreseeable manner; that it did not pose dangerous health risks in excess of those associated with the use of other similar devices; that any and all side effects were accurately reflected in the warnings; and that the Filter was adequately tested to withstand normal placement within the human body.

257.  Defendants made the foregoing misrepresentations knowing that they were false or without reasonable basis.

258.    These materials included instructions for use and a warning document that was included in the package of the Filter implanted in Decedent. Defendants' intent and purpose in making these misrepresentations was to deceive and to defraud the public and the medical community, including Decedent's healthcare providers; to gain the confidence of the public and the medical community, including Decedent's healthcare providers; to falsely assure them of the quality of the Filter and its fitness for use; and to induce the public and the medical community, including Decedent's healthcare providers, to request, recommend, prescribe, implant, purchase, and continue to use the Filter, all in reliance on Defendants' misrepresentations.

259.    The foregoing representations and omissions by Defendants were in fact false. The Filter is not safe, fit, or effective for human use in its intended and reasonably foreseeable manner. The Filter is hazardous to the user's health, and has a propensity to cause serious injuries, including without limitation, the injuries Decedent suffered. Further, the Filter has a high rate of failure and injury when compared to similar devices.

260.    In reliance upon the false and negligent misrepresentations and omissions made by Defendants, Decedent and his healthcare providers were induced to use, and did use, the Filter, thereby causing Decedent's injuries.

261.    Defendants knew and had reason to know that Decedent, his healthcare providers, and the general medical community did not have the ability to determine the true facts Defendants intentionally and/or negligently concealed and misrepresented, and would not have prescribed and implanted same, if the true facts regarding the Filter had not been concealed and misrepresented by Defendants.

262.    Defendants had sole access to material facts concerning the defective nature of the Filter and its propensity to cause death and serious injuries and damages to persons implanted with it.

263.    At the time Defendants failed to disclose and intentionally misrepresented the foregoing facts, and at the time Decedent used the Filter, Decedent and his healthcare providers were unaware of Defendants' negligent misrepresentations and omissions.

264.    Decedent, his healthcare providers, and the general medical community

41

reasonably relied upon Defendants' misrepresentations and omissions, and the concealed and misrepresented facts were critical to understanding the true dangers inherent in the use of the Filter.

265.   As a direct and proximate result of Defendants' fraudulent misrepresentations, Decedent sustained the injuries and damages described above.

## TENTH CAUSE OF ACTION
### [Fraud—Concealment]

266.   Plaintiff incorporates by reference all preceding paragraphs.

267.   In marketing and selling the Filter, Defendants concealed material facts from Decedent and his healthcare providers.

268.   Defendants' concealed material facts include, but are not limited to, the following:

    a.   That the Filter was unsafe and not fit when used for its intended purpose or in a reasonably foreseeable manner;

    b.   That the Filter posed dangerous health risks in excess of those associated with other similar devices;

    c.   That there were additional side effects related to implantation and use of the Filter that were not accurately and completely reflected in Defendants' warnings associated with the Filter; and

    d.   That the Filter was not adequately tested to withstand normal placement within the human body.

269.   Decedent and his healthcare providers were not aware of these and other facts concealed by Defendants.

270.   In concealing these and other facts, Defendants intended to deceive Decedent and his healthcare providers.

271.   Decedent and his healthcare providers reasonably and justifiably relied on Defendants' representations.

272.   As a direct and proximate result of Defendants' concealment, Decedent sustained the injuries and damages described above.

## ELEVENTH CAUSE OF ACTION
### [Wrongful Death]

273.   Plaintiff incorporates by reference all prior allegations.

274.    Decedent died as a direct and proximate result of Bard's misconduct as alleged herein.

275.    Decedent is survived by various family members, named and unnamed.

276.    As a direct and proximate result of the acts and/or omissions of Bard, Decedent's heirs and family have been deprived of his future aid, income, assistance, services, companionship, society, affection and financial support, and Plaintiff has suffered injuries and damages.

277.    Plaintiff brings these claims on behalf of Decedent's lawful heirs for his wrongful death under M.G.L. Chapter 229,S. 2 et seq.

## TWELVTH CAUSE OF ACTION
### [Survival]

278.    Plaintiff incorporates by reference all prior allegations.

279.    As a direct and proximate result of Bard's misconduct, Decedent suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of enjoyment of life, medical expenses, loss of earnings and loss of earning capacity prior to Plaintiffs' decedents' deaths.

280.    Plaintiff seeks all damages the decedent suffered as a result of Bard IVC Filter injuries prior to death.

## Punitive Damages Allegations

281.    Plaintiff incorporates by reference all preceding paragraphs.

282.    As early as 2003, Bard was aware and had knowledge of the fact that the predicates to the Filter, including the Recovery, were defective and unreasonably dangerous and were causing injury and death to patients who had received it.

283.    Data establishes that the failure rates of the Filter and its precursors are and were much higher than the rate Bard had in the past and currently continue to publish to the medical community and members of the public. Defendants knew this and continued to sell the Filter.

284.    Bard also was aware or should have been aware that the Filter and its precursors had a substantially higher failure rate than other similar products oigratn the

market, yet Defendants have failed to warn consumers about the Filter.

285.   The conduct of Bard as alleged in this Amended Complaint constitutes willful, wanton, gross, and outrageous corporate conduct that demonstrates a conscious disregard for the safety of Decedent.

286.   Bard had actual knowledge of the dangers presented by the Filter, yet consciously failed to act reasonably to:

   a.  Inform or warn Decedent, Decedent's physicians, or the public at large of these dangers; to remove the Filter from the inventory of the facility where Decedent was implanted;

   b.  Establish and maintain an adequate quality and post-market surveillance system; or

   c.  Recall the Filter from the market.

287.   Despite having knowledge of the unreasonably dangerous and defective nature of the Filter, Bard consciously disregarded the known and substantial risks of death and injury and continued to actively market and offer for sale the Filter.

288.   Further, Defendants acted in willful, wanton, gross, reckless indifference and total disregard for the health and safety of the users or consumers of the Filter, acted to serve their own interests (some of them pecuniary), and consciously disregarded the substantial risk that their product might kill or significantly harm patients, or significantly injure the rights of others.

289.   As a result, Plaintiff is entitled to an award of punitive damages to punish Defendants and deter similar conduct in the future because the defendants committed a tortious act, and because there is clear and convincing evidence that the act was accompanied by a state of mind evincing malice or its equivalent.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, as follows:

1.   For general (non-economic) damages according to proof at the time of trial, including pain and suffering;

2.   For special (economic) damages according to proof at the time of trial, including payment of past and future medical expenses;

3.    For punitive damages sufficient to punish and deter Defendants;

4.    For prejudgment interest as permitted by law;

5.    For attorneys' fees as permitted by law;

6.    For costs of suit incurred herein as permitted by law;

7.    For the treble damages pursuant to Massachusetts General Laws Chapter

93A.

8.    For such other and further relief as this Court may deem proper.

Respectfully submitted,

/s/_____
Matthew Feinberg
Law Offices of Matthew H. Feinberg
1 South Market. Building 4th Flr
Faneuil Hall Marketplace
Boston, MA 02109
617-526-0700
mattfein@mhf-law.com
*mCounsel for Plaintiff*

## JURY DEMAND

Plaintiff demands a trial by jury on all issues.

/s/_____
Matthew Feinberg
Law Offices of Matthew H. Feinberg
1 South Market. Building 4th Flr
Faneuil Hall Marketplace
Boston, MA 02109
617-526-0700
mattfein@mhf-law.com